UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KEVIN SHEILS,

                              Plaintiff,

                                              9:06-CV-0407
v.                                            (DNH/GHL)

T. FLYNN, et al.,

                              Defendants.
_____

APPEARANCES:                          OF COUNSEL:

KEVIN SHEILS, 99-A-5444
Plaintiff *pro se*
Elmira Correctional Facility
P.O. Box 500
Elmira, New York 14902

HON. ANDREW M. CUOMO                  HEATHER R. RUBINSTEIN, ESQ.
Attorney General for the State of New York
  Counsel for Defendants
615 Erie Boulevard West, Suite 102
Syracuse, New York 13204

GEORGE H. LOWE, United States Magistrate Judge

## REPORT-RECOMMENDATION

     This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable David N. Hurd, United

States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff Kevin

Sheils alleges that officials at Franklin Correctional Facility (Dr. Gerald W. Cahill, Medical

Director Dr. Glenn Champagne, Nurse Administrator T. Flynn, and Nurse Otis), Clinton

Correctional Facility (Dr. Kang Lee and Nurse Administrator T. Seamen), Bare Hill Correctional

Facility (Dr. Timothy Whalen and Nurse Administrator Brian LeCuyer), and Upstate

Correctional Facility (Nurse Susan Ryan) violated his Eighth Amendment right to adequate

medical care by failing to timely diagnose and treat a cancerous lesion on his left shoulder.

Plaintiff claims that Defendants continuously mis-diagnosed the lesion as acne.  Currently

pending before the Court are Defendants' motion for summary judgment (Dkt. No. 50) and

Plaintiff's cross-motion for summary judgment.  (Dkt. No. 53.)  Because the record does not

raise a genuine issue of material fact that Defendants were deliberately indifferent to Plaintiff's

serious medical need, I recommend that Defendants' motion be granted and Plaintiff's motion be

denied.

## I.       BACKGROUND

### A.       Introduction

Plaintiff has been incarcerated in the New York Department of Correctional Services

system ("DOCS") since October 1999.  (Dkt. No. 50-4 at 7:24-8:2.)  Prior to his DOCS

incarceration, Plaintiff was housed at the Fulton County Jail from September 1998 until October

1999.  (Dkt. No. 50-4 at 25:25-26.)

This lawsuit involves Defendants' treatment of a lesion on Plaintiff's left shoulder that

ultimately proved to be basal cell carcinoma.  Basal cell carcinoma are growths that arise in the

deepest layers of the epidermis.  This common form of cancer has an extremely low rate of

metastasis and is not usually life threatening.  (Dkt. No. 50-5, ¶ 7; Dkt. No. 50-6, ¶ 8.)  Most

commonly, basal cell carcinoma presents as a small, dome-shaped pink, red, or white bump or

cluster of bumps.  Basal cell carcinomas occur most frequently on sun-exposed areas of the body

such as the face, neck, shoulders, and back.  (Dkt. No. 50-5, ¶ 8; Dkt. No. 50-6, ¶ 9.)  Plaintiff

2

alleges that the lesion first appeared in 1998 and that Defendants continually mis-diagnosed it as acne and prescribed a series of acne medications to treat it, despite Plaintiff's insistence that the lesion was something more serious.  (Dkt. No. 1 at ¶ 13-14.)  Defendants allege that the lesion was not present until November 2003.  (Dkt. No. 50-6, ¶ 81.)  The lesion was diagnosed as basal cell carcinoma on or about July 10, 2004, and excised on July 29, 2004.  (Dkt. No. 50-6, ¶¶ 82, 85.)

> **B.      Fulton County Jail**

At his deposition, Plaintiff testified that he first noticed the lesion in 1998 and brought it to the attention of Dr. Glen at the Fulton County Jail.  (Dkt. No. 50-4 at14:9-19.)  At that time, the lesion "continued to dry up and look like a scab.  Then it would fall off and bleed. Sometimes it would be reddish with a blackish color to it."  (Dkt. No. 50-4 at 14:24-15:1.)  It was "pretty much just like a circle with some jagged edges on it perhaps."  (Dkt. No. 50-4 at 15:7-8.)  It was dime-sized.  (Dkt. No. 50-4 at 15:9-11.)

On June 13, 1999,  Dr. Glen diagnosed Plaintiff with actinic keratosis.  (Dkt. No. 50-4 at 24:2-13, 26:4-6; Dkt. No. 53-5 at A-3.)  Actinic keratosis appears as scaly or crusty bumps that form on the skin surface, most commonly on sun-exposed areas.  Actinic keratosis commonly disappears only to reappear later.  Half of actinic keratosis will go away on its own, while 10-15% of active actinic keratosis lesions progress to become squamous or basal cell carcinomas. (Dkt. No. 50-6, ¶ 12.)  Dr. Glen noted the diagnosis on Plaintiff's chart but did not discuss it with Plaintiff.  (Dkt. No. 50-4 at 24:2-13, 26:4-6.)

Plaintiff was not aware of Dr. Glen's diagnosis when he came into the DOCS system in October 1999.  (Dkt. No. 50-4 at 24:14-21.)  At some point during his DOCS incarceration,

3

however, Plaintiff received a copy of the record containing the diagnosis and alleges that he

began attempting to bring it to Defendants' attention.  (Dkt. No. 1 at ¶¶ 23, 25-26, 28.)

C.      **Franklin Correctional Facility**

Plaintiff was housed at Franklin Correctional Facility from October 6, 1999, until March

22, 2001.  (Dkt. No. 50-5, ¶ 4.)  Plaintiff has sued four officials from Franklin: Medical Director

Dr. Glenn Champagne, Dr. Gerald W. Cahill, Nurse Administrator T. Flynn, and Nurse Otis[1].

Plaintiff's medical records[2] show that on October 12, 1999, Plaintiff was given lotion to

treat his generalized acne condition.  (Dkt. No. 50-5, ¶ 13.)

On January 4, 2000, Plaintiff complained of acne to Registered Nurse Ann Landry.  Nurse

---

[1]      As discussed more fully below, Nurse Otis was never served with the complaint
and has not appeared in the action.

[2]      Defendants produced Plaintiff's medical records to the Court as exhibits to the
affidavits of Drs. Champagne and Lee.  Motions for summary judgment must be supported by
admissible evidence.  *Major League Baseball Properties, Inc. v. Salvino*, 542 F.3d 290, 309 (2d
Cir. 2008).  Hearsay evidence is not admissible unless it falls within an exception to the hearsay
rule.  Fed. R. Evid. 802.  Medical records, although hearsay, may be admissible under the
business records exception to the hearsay rule.  That exception renders admissible records of
"acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from
information transmitted by, a person with knowledge" but only if such records are "kept in the
course of a regularly conducted business activity, and if it was the regular practice of that
business activity to make the memorandum, report, record, or data compilation."  Facts
supporting admissibility must be supplied "by the testimony of the custodian or other qualified
witness or by certification" that complies with Federal Rule of Evidence 902.  Fed. R. Evid.
803(6).  Neither Dr. Champagne nor Dr. Lee's affidavit provides the information required to
support admissibility of the medical records under Federal Rule of Evidence 803.  Nor have the
records been certified in a manner that complies with Rule 902(11).  Therefore, the records are
not technically admissible.  *See Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir. 1980).  I
have considered them, however, because Plaintiff also relied on the records in his opposition to
the motion for summary judgment.  I caution defense counsel that medical records should, in the
future, be properly authenticated and accompanied by an affidavit or certification that complies
with Rule 803.

4

Landry gave Plaintiff 10% Benzoyl Peroxide ointment.  (Dkt. No. 50-5, ¶ 14.)

On February 21, 2000, Plaintiff requested a Tetracycline prescription.  Tetracycline is an antibiotic prescribed for treatment of acne.  Plaintiff told Nurse Pam Fountain that Tetracycline was something he "took on the streets" to treat his acne.  Plaintiff also requested Neutrogena soap.  After reviewing Nurse Fountain's evaluation, Defendant Dr. Champagne prescribed Tetracycline.  (Dkt. No. 50-5, ¶ 15.)

On March 21, 2000, Plaintiff requested a refill of Tetracycline.  A refill memo was sent. (Dkt. No. 50-5, ¶ 16 and Ex. A-4.)

On March 31, 2000, Dr. Champagne met with Plaintiff regarding his seizure control prescription and discussed Plaintiff's seizure disorder with him.  In an affidavit filed in support of Defendants' motion for summary judgment, Dr. Champagne states that Plaintiff did not mention any skin lesion at this appointment.  (Dkt. No. 50-5, ¶ 17.)

On April 19, 2000, Dr. Taesoo Kin observed acne on Plaintiff's chest wall.  Dr. Kin prescribed Cleocin gel.  (Dkt. No. 50-5, ¶ 19.)

On May 15, 2000, Plaintiff complained of scabies to Nurse Nancy Armstrong.  Nurse Armstrong interviewed Plaintiff and observed that he had no signs or symptoms of scabies, rash, or any other itching condition.  Nurse Armstrong told Plaintiff to notify medical staff if his condition changed.  (Dkt. No. 50-5, ¶ 20, Ex. A-9.)

On July 28, 2000, Nurse Teresa Dumas observed a lump on Plaintiff's right lower back. Plaintiff also complained of shoulder pain, ankle pain, elbow pain, panic attacks, and depression. Nurse Dumas referred Plaintiff to physical therapy for his shoulder and elbow pain.  (Dkt. No. 50-5, ¶ 21, Ex. A-10.)

On August 11, 2000, Plaintiff complained to Nurse Nancy Smith about a lump on his back.  Nurse Smith observed a "soft movable nodule on right lower back" and put Plaintiff on the M.D. call-out list.  Plaintiff additionally complained about acne on his chest and legs.  Nurse Smith observed scattered pimples in these locations and provided Plaintiff with PH cleanser and acne cream.  (Dkt. No. 50-5, ¶ 22, Ex. A-11.)

On August 21, 2000, and September 11, 2000, refill requests for Cleocin acne ointment were sent.  (Dkt. No. 50-5, ¶¶ 23-24, Ex. A-11.)

On August 22, 2000, Plaintiff again complained of the lump on his lower right back.  His medical records note that Plaintiff "has been waiting per chart for callout."  (Dkt. No. 50-5, Ex. A-11.)

On September 12, 2000, Plaintiff brought attention to the lump on his lower right back.  Nurse Patricia Cook observed "a small lump [or] lipoma over right sacroiliac joint." (Dkt. No. 50-5, ¶ 25, Ex. A-13.)  Lipoma is the most common noncancerous soft tissue growth.  A lipoma is a growth of fat cells in a thin, fibrous capsule usually found just below the skin.  Lipomas are superficial masses that may initially present in a similar fashion to basal or squamous cell carcinoma.  Lipomas do not generally require treatment but are commonly removed for superficial purposes.  (Dkt. No. 50-5, ¶ 9.)  Nurse Cook put Plaintiff on the M.D. call-out list.  (Dkt. No. 50-5, ¶ 25, Ex. A-13.)

On September 13, 2000, Dr. Champagne met with Plaintiff and noted the lipoma on his right lower back.  He noted in Plaintiff's medical record that he observed acne on Plaintiff, but did not state where.  He renewed Plaintiff's Tetracycline prescription.  (Dkt. No. 50-5, ¶ 26, Ex. A-13.)

On September 26, 2000, Plaintiff asked to see a doctor  regarding the lipoma on his back.

(Dkt. No. 50-5, Ex. A-14.)

On October 13, 2000, a refill request for Plaintiff's Tetracycline prescription was sent.

(Dkt. No. 50-5, ¶ 27, Ex. A-15.)  This refill request is the basis for Plaintiff's claims against

Nurse Otis and Drs. Cahill and Champagne[3].  In his complaint, Plaintiff alleges that:

> On or about October 13, 2000, Defendant Otis who was not
> authorized to fill a prescription drug request, forwarded a request to
> Defendants Cahill and/or Champagne for an antibiotic (Tetracycline)
> to specifically treat acne.  Soon thereafter, without being seen by
> Defendants Cahill and Champagne, the prescription drug Tetracycline
> was filled, Plaintiff was treating one acne blemish from on or about
> December 12, 1999 and February 8, 2001, to wit, never dissipated.
> It's noteworthy this lesion was allegedly acne, according to medical
> personnel.

(Dkt. No. 1 at ¶ 15.)  Dr. Cahill stated in response to Plaintiff's interrogatories that while Plaintiff

was at Franklin Correctional Facility he would not necessarily have to see Plaintiff prior to

prescribing him medications.  (Dkt. No. 53-6 at A-160,  ¶ 7.)  He stated that he could prescribe

medications without examining Plaintiff "if the inmate arrived at the facility and was out of

prescribed medication."  (Dkt. No. 53-6 at A-160 and A-161, ¶ 8.)  Plaintiff testified at his

deposition that after Dr. Cahill prescribed the Tetracycline, Plaintiff told him it was not working.

---

[3]     The October 13, 2000, incident is the only mention of Dr. Champagne in
Plaintiff's complaint.  At his deposition, Plaintiff testified that he sued Dr. Champagne because
"one morning I had brought it to his attention that, you know, I had radiation - a lot of you know,
overexposure to the sun and I thought this might be cancer.  I wasn't descriptive in terms of what
kind.  He said, oh no, it ain't.  It's not cancer.  He said, that's just acne.  I said but, you know, I
have been hearing that a lot, you know.  I said, do you see any acne on me?  He said, well, you've
got one there, that's for sure or something like that.  I don't know.  It just didn't seem plausible
from what I was hearing from him.  I just think he should have been more effective."  (Dkt. No.
50-4 at 37:13-24.)

Dr. Cahill then prescribed topical gels.  (Dkt. No. 50-4 at 38:3-8.)

On November 30, 2000, Plaintiff complained to Nurse Dumas of severe back pain from a lesion on his lower back.  Nurse Dumas checked on the status of Plaintiff's appointment for a surgical consultation regarding the lesion.  (Dkt. No. 50-5, ¶ 28, Ex. A-16.)

On December 22, 2000, Plaintiff's Tetracycline prescription was refilled.  (Dkt. No. 50-5, ¶ 29, Ex. A-17.)

On January 26, 2001, Plaintiff had a general surgery consultation regarding the mass on his lower right back.  Records from this consultation classify the mass as a "2 cm lipoma just above right lumbosacral prominence with severe pain."  (Dkt. No. 50-5, ¶ 33, Ex. A-21.)  In an affidavit filed in support of Defendants' motion for summary judgment, Dr. Champagne states that to his knowledge "[P]laintiff brought no other lesions, lumps, or superficial masses on his body to the Surgeon's attention.  The Surgeon advised that before surgical intervention to excise the probable lipoma, an MRI of [P]laintiff's back be taken to evaluate the mass and proximity to adjacent structures."  (Dkt. No. 50-5, ¶ 34.)  Dr. Champagne's affidavit does not set forth a basis for his knowledge of the content of conversations between Plaintiff and the surgeon.  The record does not contain any affidavit from the surgeon.

On February 8, 2001, Plaintiff was "talking about carpal tunnel surgery and lipoma removal."  He complained of back pain and shoulder pain and wanted to see M.D. regarding pain control.  (Dkt. No. 50-5, Ex. A-22.)

On February 9, 2001, Dr. Champagne met with Plaintiff.  Dr. Champagne states that his "medical records indicate that I discussed [P]laintiff's medical conditions at length.  Plaintiff's concerns included an impending carpal tunnel surgery, the lipoma removal, back pain and frozen

left shoulder pain.  To deal with these complaints in the interim, I initiated a physical therapy

consult for [P]laintiff's left shoulder and prescribed Robaxin for muscle relaxation.

Additionally, I scheduled blood work to further address all of [P]laintiff's complaints.  Again,

[P]laintiff did not bring my attention to any other lesions on his body, specifically on his left

shoulder."  (Dkt. No. 50-5, ¶ 36, Ex. A-22.)

On February 12, 2001, Plaintiff was scheduled to have an MRI.  However, Plaintiff

suffered from anxiety and claustrophobia and the MRI was not completed.  Plaintiff's MRI was

rescheduled at an open-MRI facility.  (Dkt. No. 50-5, ¶ 37, Ex. A-24.)

On March 9, 2001, an open MRI of Plaintiff's lumbar spine was taken.  Dr. Joseph

Pazienza opined that the mass on Plaintiff's lower back was a lipoma.  (Dkt. No. 50-5, ¶ 38, Ex.

A-26-27.)

On March 17, 2001, Plaintiff was seen by mental health staff.  He was anxious and

paranoid with ideas of flight.  He had a long list of complaints against the medical and security

staff.  He was "irritable, impatient, guarded, sarcastic, confrontational, and depressed."  He

denied voices and suicidal thoughts.  (Dkt. No. 50-5, Ex. A-28.)  This is the last entry in

Plaintiff's medical records from Franklin Correctional Facility.

Defendant Flynn is not mentioned in any of Plaintiff's medical records from Franklin

Correctional Facility.  Defendant Flynn was a Nurse Administrator at Franklin Correctional

Facility until September 2000.  (Dkt. No. 53-6 at A-140, A-143.)  Plaintiff alleges that Defendant

Flynn "was in charge of Plaintiff's medical records and reviewed them with Plaintiff on separate

occasions and should have inquired into all the acne medications when Plaintiff did not show any

signs of acne."  (Dkt. No. 1 at ¶ 14.)  Plaintiff testified at his deposition that he named Flynn as a

defendant because "I think it was his job duties as the nurse administrator and while reviewing my medical records to at least use better judgment in terms of going a little bit further with - not just saying it was acne and going along with the doctors but trying something to determine if it was really acne or cancer and he did neither."  (Dkt. No. 50-4 at 32:24-33:5.)

Plaintiff testified at his deposition that Defendant Flynn reviewed Plaintiff's medical records two or three times, primarily in regard to Plaintiff's seizure disorder.  (Dkt. No. 50-4 at 17:4-19, 18:1-7.)  Plaintiff does not remember if he had any conversations with Defendant Flynn about his records.  (Dkt. No. 50-4 at 18:10-13.)  Plaintiff does not recall if he had any conversations with Defendant Flynn about acne or acne medications while they were looking at the records together.  (Dkt. No. 50-4 at 18:14-17.)

Flynn stated in his responses to Plaintiff's interrogatories that he did not recall whether he ever personally reviewed Plaintiff's medical records or medication records.  (Dkt. No. 53-6 at A-141.)  However, he stated that he frequently did medical record reviews while employed at Franklin Correctional Facility.  (Dkt. No. 53-6 at A-142.)

In his affidavit filed in support of Defendants' motion for summary judgment, Dr. Champagne states that "[t]he lesion on [P]laintiff's left shoulder ... was not brought to the attention of [Franklin Correctional Facility]  medical staff by [P]laintiff, nor was it noted by any medical professionals."  (Dkt. No. 50-5, ¶ 42.)  He does not state a basis for personal knowledge of what Plaintiff may have said to medical staff other than himself.  He states further that "during my own treatment of a lipoma on [P]laintiff's lower right back, [P]laintiff never brought a similar abnormal skin mass on his left shoulder to my attention."  (Dkt. No. 50-5, ¶ 42.)

### D.        First Confinement at Clinton Correctional Facility

On March 22, 2001, Plaintiff was transferred to Clinton Correctional Facility.  (Dkt. No. 50-5, ¶ 39.)  Plaintiff was housed at Clinton from March 22, 2001, until July 12, 2002.  (Dkt. No. 50-6, ¶ 4.)  Plaintiff has sued two officials from Clinton: Dr. Kang Lee and Nurse Administrator Seamen.

Dr. Lee has served as a clinical physician at Clinton Correctional Facility for 24 years. (Dkt. No. 50-6, ¶¶ 1-2.)  In his unverified complaint, Plaintiff alleges that Dr. Lee "continuously and repeatedly" told Plaintiff that the lesion on his left shoulder was acne and gave Plaintiff acne creams, anti-fungal creams, and bandages to treat the lesion.  (Dkt. No. 1 at ¶ 18.)  Plaintiff testified at his deposition that he saw Dr. Lee on ten or eleven occasions at Clinton Correctional Facility.  (Dkt. No. 50-4 at 38:12-39:10.)  Plaintiff remembers telling Dr. Lee that he had been told 18 months earlier that his lesion was "only acne," but Plaintiff did not remember when the conversation took place.  (Dkt. No. 50-4 at 21:1-12.)  Dr. Lee told him the lesion was acne or a fungus and prescribed hydrocortisone cream and something to mix with it.  (Dkt. No. 50-4 at 21:17-25.)

Defendant T. Seamen was the Nurse Administrator at Clinton Correctional Facility's mental health unit from December 5, 2002, to October 30, 2003.  (Dkt. No. 53-6 at A-153.)  In his unverified complaint, Plaintiff alleges that he showed the medical record from Fulton County regarding his lesion to Defendant Seamen.  (Dkt. No. 1 at ¶ 27.)  At his deposition, Plaintiff testified that he sued Seamen because "I showed her my medical records ... and she just .... I think I might have been a little abrasive when I was trying to show her ... People keep telling me this is acne ... She just wasn't receptive.  She didn't want to hear it ... It's like nobody cared."

(Dkt. No. 50-4 at 35:20-36:4.)  Beyond this testimony and Nurse Seamen's responses to

Plaintiff's interrogatories, in which she provided no relevant substantive information, there is no

evidence regarding Nurse Seamen before the Court.

Turning to the medical records from Plaintiff's first confinement at Clinton Correctional

Facility, Plaintiff's transfer record indicated that he was being treated for seizures, mental illness,

lactose intolerance, and a "frozen" left shoulder.  For the last ailment, Plaintiff's records

indicated that he had been receiving two physical therapy sessions each week.  The records also

indicated that Plaintiff was no longer taking Tetracycline or any oral acne medication.  (Dkt. No.

50-5, ¶ 39; Dkt. No. 50-6, ¶ 14.)  Neither the affidavit of Dr. Champagne nor the affidavit of

Defendant Dr. Lee characterizes the transfer record as mentioning anything about Plaintiff's

lipoma.  However, the record stated that Plaintiff "claims (illegible) in back."  (Dkt. No. 50-5,

Ex. A-28.)

Upon transfer to Clinton, a visual assessment of Plaintiff was taken.  Dr. Lee states in his

affidavit filed in support of Defendants' motion for summary judgment that no injuries or

infections were viewed and none were complained of by Plaintiff himself.  (Dkt. No. 50-6, ¶ 15.)

Dr. Lee's affidavit does not set forth a basis for his personal knowledge of what was observed by

medical staff or said by Plaintiff.

On May 5, 2001, Nurse John Mitchell renewed Plaintiff's prescription for Tetracycline.

(Dkt. No. 50-6, ¶ 17.)

On May 24, 2001, Nurse Karen Phillips ordered acne medication for Plaintiff.  (Dkt. No.

50-6, ¶ 18.)

On June 28, 2001, Plaintiff was concerned about the "tumor on [his] back" and wanted it

removed.  (Dkt. No. 50-6, Ex. A-4.)  The medical record does not indicate the precise location of the tumor.

On July 19, 2001, Plaintiff told a nurse that he had slipped off a toilet seat and that the tumor on his back had become aggravated by this fall.  Plaintiff also complained of pain, specifically in bending.  The nurse prescribed Motrin for the pain.  Additionally, he or she reviewed a copy of Plaintiff's MRI, which stated that lipoma surgery was pending, and put Plaintiff on the M.D. call-out list for further evaluation.  (Dkt. No. 50-6, ¶ 19, Ex. A-5.)

On July 25, 2001, Nurse Marybeth Gilen ordered acne medication for Plaintiff.  (Dkt. No. 50-6, ¶ 20.)

On July 30, 2001, Plaintiff received physical therapy for pain in his left shoulder.  His physical therapy report indicates that he had been experiencing intermittent pain of the left shoulder with flare-ups.  (Dkt. No. 50-6, ¶ 21.)

On September 10, 2001, "acne aid" and "HC cream" were ordered for Plaintiff.  (Dkt. No. 50-6, Ex. A-14.)

On September 13, 2001, Plaintiff had a kenalog injection in his left shoulder "at the painful point."  Kenalog is a cortisone steroid injected into inflamed joints or tendons to deliver medication directly to problem areas, such as the shoulder, elbow, hip, or knee.  Kenalog injections are given systematically to control arthritic flares.  Dr. Lee prescribed this injection for Plaintiff because Plaintiff had finished 15 physical therapy sessions for his "frozen" shoulder pain with no relief.  (Dkt. No. 50-6, ¶ 23.)

On September 18, 2001, Plaintiff complained of continued left-shoulder pain.  Plaintiff was prescribed Naproxyn, a pain reliever.  An orthopedic referral was put in for Plaintiff.  (Dkt.

No. 50-6, ¶ 24, Ex. A-15[4].)

On September 20, 2001, at Dr. Lee's request, Plaintiff had an orthopedic consultation with Dr. Mitchell Rubinovich.  Dr. Rubinovich reported to Dr. Lee that he had examined Plaintiff and believed Plaintiff was suffering from either a rotator cuff tear or chronic rotator cuff tendinitis in his left shoulder.  There is no notation in Dr. Rubinovich's record of a lesion on Plaintiff's left shoulder.  (Dkt. No. 50-6, ¶ 25.)

On October 2, 2001, Nurse Robyn Rock prescribed a PH skin cleanser for Plaintiff.  (Dkt. No. 50-6, ¶ 26.)

On October 22, 2001, Plaintiff was seen at morning sick call, complaining of difficulty breathing and shoulder pain.  He was referred to a nurse practitioner.  (Dkt. No. 50-6, Ex. A-17.)

On November 1, 2001, Plaintiff was seen by Nurse Zahn.  He complained of left shoulder pain.  He stated that he had had the pain "for months now."  Nurse Zahn observed a decrease in the range of motion of Plaintiff's left shoulder and that it was "tender anteriorly to palpation."  Nurse Zahn prescribed Naproxyn for the pain and scheduled an orthopedic consultation.  (Dkt. No. 50-6, ¶ 27, Ex. A-17.)

On November 30, 2001, Plaintiff had an orthopedic consultation with Dr. Rubinovich.  Dr. Rubinovich conducted an arthogram of Plaintiff's left shoulder.  The results of the arthogram

_____

[4]       Dr. Lee states in his affidavit filed in support of Defendants' motion for summary judgment that Defendant Brian LeCuyer was the staff member at this visit.  (Dkt. No. 50-6, ¶ 24.)  However, Defendant LeCuyer stated in his responses to Plaintiff's interrogatories that he was employed at Bare Hill Correctional Facility from July 2000-2003 and that he did not maintain any certificates for medical practice during that time.  (Dkt. No. 53-6, ¶¶ 1, 11.)  Later he became certified as a nurse practitioner.  (Dkt. No. 53-6, ¶ 12.)  It is thus not clear to the undersigned how Defendant LeCuyer could have been the staff member at this September 2001 medical appointment at Clinton Correctional Facility.

were negative for rotator cuff tear.  Dr. Rubinovich reported to Nurse Zahn that "[t]he major problem [Plaintiff] is having right now is not the shoulder, but his left hand."  (Dkt. No. 50-6, ¶ 29.)  Dr. Rubinovich's report did not mention a lesion on Plaintiff's left shoulder.  (Dkt. No. 50-6, Ex. A-12.)

On December 4, 2001, Nurse Walker ordered over-the-counter acne cream for Plaintiff. (Dkt. No. 50-6, ¶ 30.)

On December 10, 2001, hydrocortisone cream was ordered for Plaintiff.  (Dkt. No. 50-6, Ex. A-19.)

On December 18, 2001, Nurse Robyn Rock ordered hydrocortisone cream for Plaintiff. (Dkt. No. 50-6, ¶ 31.)

On February 11, 2002, Plaintiff complained of the lipoma on his right lower back and of a spot on the back of his right arm.  Dr. Sadig was called for an evaluation of Plaintiff's complaints.  (Dkt. No. 50-6, ¶ 33, Ex. A-24.)  Anti-dandruff tar shampoo and PH skin cleanser were ordered for Plaintiff and a standing order was issued for Plaintiff to receive tar shampoo and skin cleanser monthly.  (Dkt. No. 50-6, ¶ 34.)

On February 19, 2002, acne cream was issued for Plaintiff.  A standing order was issued for Plaintiff to receive acne cream monthly.  (Dkt. No. 50-6, ¶ 35.)

On March 14, 2002, Plaintiff had an orthopedic consultation with Dr. Rubinovich regarding the pain in his left shoulder.  Following this consultation, Dr. Rubinovich sent Dr. Lee a report.  Dr. Rubinovich's report did not mention a lesion on Plaintiff's left shoulder.  (Dkt. No. 50-6, ¶ 36.)

On March 21, 2002, Dr. Lee reviewed Dr. Rubinovich's report and noted "Left-shoulder

rotator cuff tendinitis - injected 3-14-02 with excellent relief."  At this time Dr. Lee asked that

Plaintiff be scheduled for reevaluation and further x-rays of his left shoulder.  (Dkt. No. 50-6, ¶

37.)

On June 17, 2002, acne medication was ordered for Plaintiff.  (Dkt. No. 50-6, Ex. A-28.)

On July 5, 2002, Plaintiff met again with Dr. Rubinovich for treatment of the chronic

rotator cuff tendinitis in his left shoulder.  In a post-evaluation report sent to Nurse Miller, Dr.

Rubinovich noted that conservative care had failed to relieve Plaintiff's pain.  He suggested that

an acromioplasty be performed.  (Dkt. No. 50-6, ¶ 40.)  Acrominoplasty is the surgical removal

or an anterior spur of the acromion to relieve mechanical compression of the rotator cuff.

Dorland's Illustrated Medical Dictionary 21 (30th ed. 2003).  There is no notation in the report

regarding a lesion on Plaintiff's left shoulder.

On July 10, 2002, Plaintiff was transferred from Clinton Correctional Facility to Bare Hill

Correctional Facility.  (Dkt. No. 50-6, ¶ 41.)

### E.     Bare Hill Correctional Facility

Plaintiff was housed at Bare Hill Correctional Facility from July 10, 2002,  to March 28,

2003.  (Dkt. No. 50-6, ¶¶ 41, 53.)  He has sued two officials from this facility: Dr. Timothy

Whalen and Nurse Administrator Brian LeCuyer.

Plaintiff's unverified complaint alleges that he showed Dr. Whalen the medical record

from Fulton County regarding the lesion on his left shoulder.   (Dkt. No. 1 at ¶ 23.)  It further

alleges that on one occasion when he attended sick call at Bare Hill Correctional Facility, the

lesion on his left shoulder was extremely red, irritated, inflamed, dried, and cracked and that Dr.

Whalen prescribed lotion to treat dry skin.  (Dkt. No. 1 at ¶ 22.)  At his deposition, Plaintiff

16

testified that "I was sitting .... in his office one day ... and [the lesion] was close to bleeding. It was cracked open and really irritated. He had prescribed LacHydrin ... But once again nobody had done any exploratory tests or anything. Just basically by the naked eye and saying that it's nothing serious." (Dkt. No. 50-4 at 34:4-12.)

Defendant Brian LeCuyer was a Nurse Administrator at Bare Hill Correctional Facility from July 2000-2003. (Dkt. No. 53-6 at A-146.) Plaintiff's unverified complaint alleges that he showed LeCuyer the medical record from Fulton County regarding the lesion on Plaintiff's left shoulder. (Dkt. No. 1 at ¶ 23.) At his deposition, Plaintiff testified that he named LeCuyer as a defendant because "I think it was his job duties as the nurse administrator and while reviewing my medical records to at least use better judgment in terms of going a little bit further with - not just saying it was acne and going along with the doctors but trying something to determine if it was really acne or cancer and he did neither." (Dkt. No. 50-4 at 32:24-33:5, 33:14-23.)

LeCuyer stated in his responses to Plaintiff's interrogatories that he does not recall if he ever called Plaintiff to his office or the records office to review his medical records. (Dkt. No. 53-6 at A-147.) He further stated that he has never personally scheduled any inmate to see a dermatologist or skin specialist or to undergo a biopsy. (Dkt. No. 53-6 at A-150.)

Plaintiff's medical records from Bare Hill show that on September 18, 2002, Dr. Rubinovich performed acrominoplasty surgery on Plaintiff's left shoulder at Albany Medical Center. (Dkt. No. 50-6, ¶ 44.)

On September 21, 2002, Plaintiff complained of two puncture wounds. His left shoulder was cleaned and dried and kept open to heal. (Dkt. No. 50-6, Ex. A-39.)

On October 2, 2002, Plaintiff had a general surgery consultation with Dr. Jay V. Dewell

regarding the lipoma on his lower right back.  Dr. Dewell reported that "[t]he lesion has been

present for at least two years and is quite painful.  An MRI has identified the structure and

appears to be most consistent with that of lipoma."  Dr. Dewell's report did not mention any

lesion on Plaintiff's left shoulder.  (Dkt. No. 50-6, ¶ 45, Ex. A-40.)

On October 31, 2002, Plaintiff had a post-operative consultation with Dr. Rubinovich.  In

a report sent to Dr. Whalen, Dr. Rubinovich suggested physical therapy sessions if the pain

continued.  The report did not mention any lesion on Plaintiff's left shoulder.  (Dkt. No. 50-6, ¶

47, Ex. A-42)

On December 5, 2002, Plaintiff asked Nurse Warner about the status of surgery to remove

the lipoma on his right lower back.  Nurse Warner told Plaintiff that the surgery would take place

within the month.  (Dkt. No. 50-6, ¶ 48.)

On January 6, 2003, Plaintiff was transferred to Alice Hyde Medical Center, where Dr.

Dewell excised the lipoma on his lower right back.  In his affidavit filed in support of

Defendants' motion for summary judgment, Dr. Lee states that "at no time prior to this surgery

did [P]laintiff indicate that he had any other suspect lesions or lumps on his body that he felt

should be examined or removed."  (Dkt. No. 50-6, ¶ 50.)  However, Dr. Lee does not state a basis

for his knowledge of the contents of conversations between Plaintiff and Dr. Dewell.  There is no

affidavit from Dr. Dewell in the record.

On January 27, 2003, acne was observed on Plaintiff's chin and face.  Clindamycin acne

ointment, an antibiotic commonly used to treat acne infections, was issued to treat Plaintiff's

acne.  (Dkt. No. 50-6, ¶ 51.)

On March 13, 2003, a new prescription for an anti-acne gel was ordered for Plaintiff.

(Dkt. No. 50-6, ¶ 52.)

On March 28, 2003, Plaintiff was transferred from Bare Hill Correctional Facility back to Clinton Correctional Facility.  (Dkt. No. 50-6, ¶ 53.)

**F.      Second Confinement at Clinton Correctional Facility**

Plaintiff was confined at Clinton Correctional Facility from March 28, 2003, until March 2, 2004.  (Dkt. No. 50-6, ¶ 4.)

Upon Plaintiff's arrival at Clinton, Nurse Miller examined him.  Plaintiff was wearing a t-shirt and shorts.  Nurse Miller noted an ecchymotic[5] area on the right side of Plaintiff's forehead, but did not note any other issues with his skin.  (Dkt. No. 50-6, ¶ 54, Ex. A-55.)

On November 5, 2003, Plaintiff's medical records show that he complained to Nurse Miller that he was dizzy, that he had loose teeth, that he had headaches, that his vision was blurry in his left eye, that his left leg hurt, that his back hurt from where he had his surgery, and that his neck hurt.  Nurse Miller examined him.  Her notes do not mention a lesion on Plaintiff's left shoulder.  (Dkt. No. 50-6, Ex. A-57.)

On November 24, 2003, Plaintiff reported a bump on his shoulder.  He said it had been there for four years.  (Dkt. No. 50-6, Ex. A-58.)  This is the first reference in Plaintiff's medical records to the lesion on Plaintiff's left shoulder since Dr. Glen's June 13, 1999, diagnosis of actinic keratosis.

On December 1, 2003, Nurse Miller requested a refill of spectazole cream and LacHydrin for Plaintiff.  (Dkt. No. 50-6, ¶ 61.)

---

[5]      A small hemorrhagic spot that forms a nonelevated, rounded, or irregular blue or purplish patch.  <u>Dorland's Illustrated Medical Dictionary</u> 584 (30th ed. 2003).

On December 17, 2003, Plaintiff was seen at his cell by Nurse Miller.  He complained of vertigo and fainting.  Nurse Miller observed a pink lesion on Plaintiff's left shoulder.  Plaintiff told her it had been there for five years and that it "bleeds at times."  Dr. Lee's affidavit states that "Nurse Miller put [P]laintiff on the M.D. call-out list for evaluation of the lesion on [P]laintiff's left shoulder."  (Dkt. No. 50-6, ¶ 62.)   Nurse Miller's note actually says "schedule callout (1) vertigo, fainting per pt. since 10/31 incident; (2) _____."  The "(2)" is blank.  (Dkt. No. 50-6, ¶ 62, Ex. A-59.)

On January 26, 2004, Dr. Rubinovich prepared a report.  On physical examination, he found that Plaintiff was "a healthy, alert, 44-year old gentleman.  Head and neck is within normal limits.  The chest is clear to auscultation and percussion.  Heart sounds are normal.  The belly is soft and free of masses or tenderness.  Rectal and genital exam were deferred.  Integumentary system is normal.  There is no lymphadenopathy.  The hands show decreased sensation in the ulnar nerve distribution and some weakness.  There is no gross wasting as of yet."  Dr. Rubinovich diagnosed Plaintiff with bilateral ulnar tunnel syndrome.  (Dkt. No. 50-6, Ex. A-60.)  Dr. Rubinovich's report does not mention the lesion on Plaintiff's left shoulder, although Defendants acknowledge that the lesion existed on January 26, 2004.

On January 27, 2004, Plaintiff was temporarily transferred to Alice Hyde Medical Center for an ulnar nerve transposition of the right elbow.  Dr. Rubinovich performed the surgery.  (Dkt. No. 50-6, ¶ 63.)  On February 17, 2004, the staples were removed from Plaintiff's elbow and it was noted that the wound healed well.  (Dkt. No. 50-6, Ex. A-62.)

On February 20, 2004, LacHydrin lotion was ordered for Plaintiff.  (Dkt. No. 50-6, Ex. A-62.)

20

On March 1, 2004, Plaintiff was temporarily transferred to Alice Hyde Medical Center for an ulnar nerve transposition on his left elbow.  Dr. Rubinovich performed the procedure.  (Dkt. No. 50-6, ¶ 67.)

On March 2, 2004, Plaintiff was transferred from Alice Hyde to Upstate Correctional Facility.  (Dkt. No. 50-6, ¶ 68.)

### G.    Upstate Correctional Facility

Plaintiff was confined at Upstate Correctional Facility beginning on March 2, 2004. (Dkt. No. 50-6, ¶ 68.)  He has sued one official from that facility: Nurse Susan Ryan.  Defendant Ryan has been a registered nurse at Upstate Correctional Facility since the facility opened.  (Dkt. No. 53-7 at A-180-81.)  In his unverified complaint, Plaintiff alleges that he showed Nurse Ryan his medical records from Fulton County at a cell-side sick call.  (Dkt. No. 1 at ¶ 28.)  At this visit, Nurse Ryan viewed Plaintiff through a six inch by eight inch window that was at Plaintiff's chin height.  (Dkt. No. 1 at ¶ 29.)  Defendant Ryan informed Plaintiff that the lesion on his left shoulder looked good and was healing.  (Dkt. No. 1 at ¶ 30.)

At his deposition, Plaintiff testified that he sued Nurse Ryan because "one day [the lesion] was bleeding all over the place.  I mean, it was really bleeding bad, you know.  She just looked at it and said that it was healing.  She said, well, it looks better today.  It's healing.  I didn't know this until later on after I had got some of my medical records and she had entered the size of a dime but looked good as if was actually healing but hadn't been treated at that juncture. Then a lot of other times she would come around and say, well, yeah, I told you.  It's just dry skin, you know.  I just don't think that she was effective either in terms of .. her diagnosis." (Dkt. No. 50-4 at 39:20-40:7.)

21

In her responses to Plaintiff's interrogatories, Nurse Ryan stated that she saw Plaintiff at his cell regarding the lesion on his shoulder on numerous occasions.  (Dkt. No. 53-7 at A-181.) She stated that she is tall enough to see into an inmate's cell at Upstate Correctional Facility.  *Id*. She stated that she referred Plaintiff to a physician's assistant and to Dr. Weissman for treatment of the lesion on his left shoulder.  *Id*.  at A-182.  She stated that fair skinned individuals are at a higher risk for developing skin cancer.  *Id.* at A-183.  Nurse Ryan could not recall whether she ever told Plaintiff that the lesion on his shoulder looked good and was healing.  *Id*.  at A-184. Nurse Ryan stated that basal cell skin cancer cannot be treated with LacHydrin lotion.  *Id*.

Plaintiff's medical records from Upstate show that on March 14, 2004, Plaintiff reported that his skin was dry and itchy and asked for cream.  A refill prescription for LacHydrin was issued.  (Dkt. No. 50-6, ¶ 69.)

On March 16, 2004, Plaintiff requested cream again.  He was told it should arrive that evening.  (Dkt. No. 50-6, Ex. A-64.)

On March 21, 2004, Plaintiff requested skin cream and complained about his left ear.  He was examined and no sign of infection was found.  (Dkt. No. 50-6, Ex. A-65.)

On March 31, 2004, at 2:00 p.m. Plaintiff was seen by Nurse Debbie Sieradski and found to have "positive nail fungus" for which he was given Sporadal.  Additionally, Nurse Sieradski observed a "non breathing lesion shoulder diagnosed with Actinic Keratosis."  (Dkt. No. 50-6, ¶ 72, Ex. A-68.)

On March 31, 2004, at 6:45 p.m. Plaintiff complained to Nurse Ryan of "pain in neck since 3/1/03, fungus on nails and raised growth on left shoulder." He also complained of dizziness and "sounds" in his left ear.   Nurse Ryan observed a "raised and healed dime sized

22

growth" and told Plaintiff not to pick at the growth with his fingers.  Nurse Ryan's report states

that Plaintiff said that his symptoms were a "result of alleged attack on 10/31/03."  (Dkt. No. 50-

6, ¶ 73, Ex. A-69.)

On April 14, 2004, Plaintiff complained to Nurse Philip Dabiew about his dry, flaky skin

and of being cold.  When Nurse Dabiew asked to see the specific areas of skin of which Plaintiff

complained, Plaintiff "became agitated, swearing at nurse and threw pills at window."  Nurse

Dabiew filed a misbehavior report.  (Dkt. No. 50-6, ¶ 74.)

On April 16, 2004, Plaintiff requested LacHydrin lotion.  His request was denied because

"[o]rder completed.  No medical need to restart at this time."  (Dkt. No. 50-6, Ex. A-71.)

On April 30, 2004, Plaintiff complained of dry skin and requested LacHydrin.  He had put

toothpaste on his right and left arms, and was told that that was probably drying his skin out

more.  He also complained of fainting.  (Dkt. No. 50-6, Ex. A-72.)

On May 6, 2004, Plaintiff complained to Nurse Ryan about dry skin and a rash on his

chest.  Nurse Ryan observed Plaintiff and found no signs or symptoms of a rash, infection, or

dermatitis on Plaintiff's chest.  When Nurse Ryan told Plaintiff to finish the LacHydrin lotion he

had been given, Plaintiff became verbally abusive.  Nurse Ryan advised Plaintiff to inform

medical staff if any new signs or symptoms emerged.  (Dkt. No. 50-6, ¶ 75.)

On May 22, 2004, Plaintiff told Nurse Lashway "I had basal carcinoma in the past and

lesions look like that.  I want to see a doctor."  (Dkt. No. 50-6, ¶ 76)   Plaintiff testified at his

deposition, however, that he had never been diagnosed with basal cell carcinoma prior to October

1999.  (Dkt. No. 50-4 at 17:1-3.)  Nurse Lashway noted the Plaintiff's lesion was red, raised, and

negative for crusty drainage.  Nurse Lashway scheduled an appointment with Dr. Johnson to

evaluate Plaintiff's lesion.  (Dkt. No. 50-6, ¶ 76)

Plaintiff testified at his deposition that, in May 2004, Dr. Johnson determined that a

biopsy should be taken of the lesion on Plaintiff's left shoulder.  Dr. Johnson based this opinion

on one examination "through a little window.  No touching."  (Dkt. No. 50-4 at 40:14-41:22.)

On May 24, 2004, "an internal consult for minor surgery on [P]laintiff's left shoulder was

scheduled."  (Dkt. No. 50-6, ¶ 78.)

On June 7, 2004, Plaintiff requested medical attention for his skin.  When Nurse Ryan

asked him where his skin problem was, Plaintiff extended both arms.  Nurse Ryan observed no

dry or scaly skin, no reddened areas, no rash, and no other signs of dermatitis.  Nurse Ryan

requested a Nurse Administrator call-out for further evaluation of Plaintiff's medical needs.

(Dkt. No. 50-6, ¶ 80.)

On July 1, 2004, Plaintiff complained of very itchy dry skin.  (Dkt. No. 50-4, Ex. A-80.)

On July 6, 2004, Dr. E. Weissmen performed a punch biopsy of the lesion on Plaintiff's

left shoulder.  The biopsy was sent to Bio-Reference Laboratories for a pathology report.  Bio-

Reference Laboratories in turn sent the test for interpretation to Morristown Pathology

Associates.  (Dkt. No. 50-6, ¶ 81.)

On July 10, 2004, Bio-Reference Laboratories received a report stating that Plaintiff's

biopsy was positive for basal cell carcinoma.  (Dkt. No. 50-6, ¶ 82.)

On July 15, 2004, Bio Reference Laboratories generated a report on Plaintiff's biopsy to

be sent to Upstate Correctional Facility.  (Dkt. No. 50-6, ¶ 83.)

On July 27, 2004, Plaintiff's medical records indicate that the results of the biopsy had

been received by Upstate Correctional Facility.  An internal consult for further excision of the

basal cell carcinoma was sent by Dr. Johnson to Dr. Weissmen on that date.  (Dkt. No. 50-6, ¶ 84.)

On July 29, 2004, the lesion on Plaintiff's left shoulder was re-excised by Dr. Weissmen. (Dkt. No. 50-6, ¶ 85.)

On August 2, 2004, Plaintiff cut his wrists.  Plaintiff was immediately taken to the emergency room in the Upstate infirmary.  (Dkt. No. 50-6, ¶ 86.)  Plaintiff was treated for six superficial lacerations across both wrists.  No bleeding was noted.  Plaintiff stated "I cut out the cancer."  (Dkt. No. 50-6, ¶ 87.)  Plaintiff testified at his deposition that he tried to kill himself because he had cancer and believed he was going to die.  He believed that his death was imminent because no one explained to him that his cancer was treatable.  (Dkt. No. 50-4 at 49:4-21.)

On September 21, 2004, Plaintiff met with Dr. Dewell for a full skin evaluation and excision of any suspicious lesions.  Dr. Dewell observed "another raised, erythematous, excoriated lesion about 1 cm in diameter located in the posterior aspect of the shoulder and a third slightly small erythematous lesion located on the upper deltoid region of left arm."  Dr. Dewell scheduled a wide excision of all lesions.  (Dkt. No. 50-6, ¶ 88.)

On November 8, 2004, Plaintiff was transferred to Alice Hyde Medical Center.  (Dkt. No. 50-6, ¶ 89.)  Four lesions were excised.  Dr. Leonardo Dishman's report refers to each lesion as basal cell carcinoma.  (Dkt. No. 50-6, Ex. A-90.)

On December 14, 2004, Plaintiff had a post-operative appointment with Dr. Dewell.  The copy of this record provided by Defendants to the Court is missing large sections of text.  Dr. Lee characterizes the report as stating that "all lesions were completely excised with negative margins

25

and ... all surgical sites appeared to be healing well.  Dr. Dewell recommended that preemptive

screening techniques for [P]laintiff be enforced and that [P]laintiff be evaluated by a

dermatologist twice every year."  (Dkt. No. 50-6, ¶ 91.)  The report also appears to state that

Plaintiff is "at a dramatically increased risk for the development" of cancer in the future.  (Dkt.

No. 50-6, Ex. A-96.)

### H.    Plaintiff's Care After The Excision of the Lesion

In an affidavit filed in support of Defendants' motion for summary judgment, Dr. Lee

states that "[p]reventative screening techniques have been enforced and [P]laintiff is currently

scheduled to see a dermatologist twice a year."  (Dkt. No. 50-6, ¶ 92.)  Plaintiff testified that he is

scheduled to see a dermatologist once or twice a year "but unfortunately it doesn't appear that I

get there until I bring it to their attention." (Dkt. No. 50-4 at 31:22-24.)  Plaintiff had 17 more

lesions removed from his legs in May or June 2007.  (Dkt. No. 50-4 at 31:7-11.)

Dr. Lee states that Plaintiff's left-shoulder lesion "was not ignored and was excised and

re-excised consistent with the standard of care in the medical community.  Additionally, Plaintiff

is currently screened for lesions in a preventative fashion that ensures continual medical

attention.  Plaintiff's skin condition was never urgent, and was monitored and treated."  (Dkt. No.

50-6, ¶¶ 93-94.)

### I.    Conclusions Regarding the Factual Record

Plaintiff asserts that the lesion appeared on his left shoulder prior to his entry into the

DOCS system.  Defendants assert that the record shows that the lesion on Plaintiff's left shoulder

did not exist until November 24, 2003, and that the initial "biopsy was taken at Upstate

Correctional Facility exactly 7 months and 12 days after [P]laintiff's medical records first reflect

he brought the lesion to the attention of prison medical personnel." (Dkt. No. 50-6, ¶ 81.)

There is sufficient evidence to raise a genuine issue of material fact that the lesion appeared sometime prior to June 13, 1999. Plaintiff's medical record from the Fulton County Jail shows that he complained of the lesion in June 1999. His statement in November 2003 that he had had the lesion for four years is consistent with that fact. I note, also, that a reasonable person could conclude that the absence of any mention of the lesion in Dr. Rubinovich's reports in 2001 and 2002 does not establish that the lesion did not exist at that time. Dr. Rubinovich's January 26, 2004, report also makes no mention of the lesion and Defendants acknowledge that the lesion existed at that time.

Accordingly, taken in the light most favorable to Plaintiff, the evidence raises a genuine issue of material fact that Plaintiff had a lesion on his left shoulder from the time he entered the DOCS system in October 1999. Moreover, there is a genuine issue of material fact that the lesion had been diagnosed as actinic keratosis, a possible precursor of basal cell carcinoma. The issue before the Court is whether Defendants' failure to diagnose the lesion as basal cell carcinoma until July 2004 violated Plaintiff's constitutional rights.

## II.    LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

a genuine issue of material[6] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[7]

    If the moving party meets its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."[9]  Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party[10]."

## III.    ANALYSIS

### A.    Eighth Amendment Claims

    Plaintiff claims that Defendants violated his Eighth Amendment rights.  The Eighth

---

    [6]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

    [7]    *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) [citation omitted]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) [citation omitted].

    [8]    Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations . . . of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

    [9]    *Matsushita*, 475 U.S. at 585-86; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations . . . of the [plaintiff's] pleading . . . .").

    [10]    *Ross v. McGinnis*, 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar. 29, 2004) [internal quotations omitted] [emphasis added].

Amendment prohibits the infliction of cruel and unusual punishments.  U.S. Const. amend. VIII.

"Cruel and unusual" punishments are those that are incompatible with "the evolving standards of

decency that mark the progress of a maturing society" or that "involve the unnecessary and

wanton infliction of pain."  *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976).  Prison officials'

"deliberate indifference to serious medial needs of prisoners constitutes the unnecessary and

wanton infliction of pain."  *Id.* at 103-04.  However, not every claim by a prisoner that he has not

received adequate medical treatment states a violation of the Eighth Amendment.  *Id.* at 105.  To

prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two

things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant

was *deliberately indifferent* to that serious medical need.  *Id.* at 104; *Chance v. Armstrong*, 143

F.3d 698, 702 (2d Cir. 1998).

Defendants concede for the purposes of this motion that Plaintiff suffered from a serious

medical need.  (Dkt. No. 50-7 at 7-8.)  They argue, however, that they were not deliberately

indifferent to that need.

A prison official acts with deliberate indifference when he "knows of and disregards an

excessive risk to inmate health or safety."  *Chance*, 143 F.3d at 702.  To prove that a medical

provider was deliberately indifferent to a serious medical need, an inmate must prove that (1) the

prison medical care provider was aware of facts from which the inference could be drawn that the

inmate had a serious medical need; and (2) that the medical care provider actually drew that

inference.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Chance*, 143 F.3d at 702-703.  A

"complaint that a physician has been negligent in diagnosing or treating a medical condition does

not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical

malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 105-06.  The distinction between medical malpractice and an Eighth Amendment violation is illustrated by two cases regarding the failure by prison medical personnel to diagnose an inmate with cancer.

In *Thomas v. Wright*, No. Civ. 9:99-CV-2071 (FJS/GLS), 2002 WL 31309190 (N.D.N.Y. Oct. 11, 2002)[11], prison officials failed to diagnose an inmate's colon cancer.  Prior to his diagnosis, the inmate had reported symptoms including rectal bleeding, pain in his scrotal area, constipation, a burning sensation with urination, blood in his urine and stool, and discharge from his penis.  The inmate first reported symptoms in April 1996.  He was prescribed stool softener and milk of magnesia.  The inmate complained of symptoms again in June 1996 and was not prescribed any medication.  In July 1996 the inmate complained again of symptoms and was prescribed an antibiotic.  In August 1996 the inmate complained twice of symptoms and was prescribed a stool softener, milk of magnesia, and metamucil.  The inmate complained of symptoms twice in September 1996, and urinalysis and blood work were ordered.  In October 1996, another urinalysis was performed and the inmate underwent a renal ultrasound.  The ultrasound and a kidney/ureter/bladder x-ray showed no abnormalities.  The inmate complained of symptoms again in November 1996.  Another urinalysis was ordered and the inmate was referred to a kidney specialist.  The inmate complained of symptoms again in January 1997.  The inmate was prescribed an analgesic and another urinalysis was ordered.  Four days later, the specialist diagnosed the inmate with a swollen prostate and ordered blood work and another

---

[11]    The undersigned will provide a copy of this unpublished decision to Plaintiff in light of the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

urinalysis.  About two weeks later, the inmate was admitted to the infirmary and more tests were

ordered.  In February 1997, the inmate was admitted to Albany Medical Center, where a CT scan

revealed colon cancer.  The inmate sued, claiming that medical staff violated his Eighth

Amendment rights by failing to diagnose his cancer.  The court granted the prison officials'

motion for summary judgment, finding that:

> the record clearly shows that the defendants were not deliberately
> indifferent to Thomas' serious medical needs.  Although they may
> have failed to diagnose or even detect his cancer, the record does not
> show that they did so deliberately.  Furthermore, the record does not
> show that they disregarded his medical needs.  He was seen numerous
> times and given various medications to alleviate his pain and
> suffering.  Despite not diagnosing him properly, the defendants
> repeatedly ordered tests and continued to get normal results from the
> tests they ordered.

*Thomas*, 2002 WL 31309190, at * 9.

In *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999), prison officials failed to diagnose

an inmate's cancer or prescribe pain medication despite their subjective awareness of the

inmate's intense pain and other symptoms.  Upon his entry into the prison system in August

1996, the inmate reported that he had experienced burning abdominal pains for approximately

five months.  He was not examined by a doctor.  Thereafter, the inmate reported severe

abdominal pain, vomiting, and nausea.  He was examined by a nurse and prescribed a liquid diet

and pepto-bismol.  He was not examined by a doctor.  In early September 1996, the inmate

experienced severe intestinal pain and vomited for one and a half hours.  Without examining

him, the doctor prescribed a liquid diet, Tylenol, and pepto-bismol.  Two days later, the doctor

examined the inmate for the first time.  The doctor observed that the inmate was in severe pain

and that his feces had a foul smell.  The doctor ordered blood work and a urinalysis and

prescribed an anti-gas medication.  The inmate took the medication for about a month and then

the doctor ordered that the prescription not be refilled.  The inmate's pain returned and he began

filing requests for treatment.  In late October 1996, the doctor examined the inmate.  He

acknowledged the inmate's pain and again prescribed the anti-gas medication.  He also ordered

another urinalysis and directed a follow-up appointment in one week if the inmate did not

improve.  Although the inmate continued to report pain to the nurses and experienced severe

symptoms, the doctor did not see him again for more than a month.  At that time, the doctor

simply re-prescribed the anti-gas medication.  The inmate continued to experience pain, but the

doctor did not see him again for nearly a month.  At that time, the doctor noted that the inmate

was experiencing severe symptoms and that the anti-gas medication was not working.  The

doctor re-prescribed the anti-gas medication and prescribed a medication designed to promote the

increased motion of food through the gastrointestinal tract.  In late January 1997, the inmate

submitted an inmate request form to the doctor stating that the medicine was not helping, that he

could not eat, that he was in pain all of the time, that he had lost fifteen pounds, and that he felt

like he was dying.  The doctor did not respond.  A week later, the inmate filed another request to

see the doctor, stating that his condition was getting worse.  At about that time, the inmate

contacted his daughter and told her that he felt that he was dying.  She contacted the jail and was

assured that the jail "would stay on top of the situation."  That day, the doctor examined the

inmate and found that he had lost a significant amount of weight.  However, the doctor did not

order any further examinations and simply prescribed a medication for ulcers.  In early February

1997, a correctional officer brought the inmate to the medical department, where a nurse noted

that he was vomiting and pale, that he had lost significant weight, and that he could not even

32

tolerate liquids.  Two days later, the doctor noted that the inmate was in severe pain, was likely

dehydrated, had lost almost twenty pounds in two months, and had a possible diagnosis of

cancer.  The doctor ordered blood and urine work, a CT scan, and a chest x-ray.  Six days later,

when the tests revealed the existence of an intestinal obstruction, the inmate was hospitalized.  At

that time, a nurse estimated that it would cost $8,000-15,000 to hospitalize the inmate.  The next

day, the inmate was prematurely released from the jail.  He was discharged from the hospital

without diagnosis two days later.  Several days later, he was admitted to a VA hospital and

diagnosed with terminal cancer.  Before his death, he filed a civil rights action.  The district court

granted summary judgment for the defendants, concluding that they had not been deliberately

indifferent to either the inmate's pain or his cancer.  The Eleventh Circuit reversed in part and

affirmed in part.  The appellate court agreed with the district court that the doctor and nurse

could *not* be liable for failing to diagnose the inmate's cancer because "[w]hile that failure can be

deemed extremely negligent, it does not cross the line to deliberate indifference."  However, the

appellate court reversed regarding the prison officials' treatment of the inmate's pain.  The

appellate court found that a reasonable jury could conclude, based on the officials' failure to

provide pain medication and their frequent delays in examining the inmate, that the officials were

deliberately indifferent to the inmate's pain.

  Even viewed in the light most favorable to Plaintiff, the situation here is much more like

the situation in *Thomas* than the situation in *McElligott*.  While Defendants' failure to

immediately diagnose the lesion on Plaintiff's shoulder as cancer was undoubtedly frustrating

and frightening for Plaintiff, the record simply does not indicate any behavior on Defendants'

part that elevates the situation from possible medical malpractice to the level of a constitutional

violation.  Plaintiff received frequent medical care, as his voluminous medical records demonstrate.  Medical staff prescribed various medications in an attempt to relieve his symptoms.  At no point was Plaintiff in the type of excruciating pain described in *McElligott*.  When he complained of pain, he was prescribed pain medication.  Moreover, Plaintiff's own deposition testimony illustrates that his complaints about his treatment sound more appropriately in state tort law than in federal constitutional law.  Plaintiff testified that he sued Dr. Champagne because he thought Dr. Champagne "should have been more effective" (Dkt. No. 50-4 at 37:23-24), Nurse Administrator Flynn because Flynn should have used "better judgment" (Dkt. No. 50-4 at 32:24-33:5), Dr. Lee because he refused to credit Plaintiff's opinion that the lesion was not acne (Dkt. No. 50-4 at 21:15-25), Nurse Administrator Seamen because she "wasn't receptive" (Dkt. No. 50-4 at 35:20-36:4), Dr. Whalen because he should have "done ... exploratory tests" (Dkt. No. 50-4 at 34:4-12), Nurse Administrator LeCuyer because he should have used "better judgment" (Dkt. No. 50-4 at 32:24-33:5), and Nurse Ryan because she should have been more effective (Dkt. No. 50-4 at 39:20-40:7).  The record does not raise a genuine issue of material fact that Defendants were deliberately indifferent to Plaintiff's serious medical need.  Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's complaint.

### B.      Failure to Serve Defendant Otis

Defendant Otis was never served with the complaint.  (Dkt. No. 9.)  Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within ***120 days*** after the filing of the complaint.  Fed. R. Civ. P. 4(m).  This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order

25), which provide that all defendants must be served with the summons and complaint within *sixty (60) days* of the filing of the complaint.  N.D.N.Y. L.R. 4.1(b) [emphasis added].  Here, more than 120 days have elapsed since the filing of the Complaint and Defendant Otis has not been served.  As a result, Plaintiff is in violation of both the Federal Rules of Civil Procedure and the Local Rules of Practice for this Court.  I therefore recommend that all claims against Defendant Otis be dismissed.

### C.     Plaintiff's Motion for Summary Judgment

The Clerk has classified Plaintiff's opposition to Defendants' motion for summary judgment as a cross-motion for summary judgment.  (Dkt. No. 53.)  To the extent that Plaintiff seeks "an order granting summary judgment in favor of Plaintiff" (Dkt. No. 53), I recommend that the motion be denied in light of my finding that Defendants are entitled to summary judgment dismissing Plaintiff's complaint.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 50) be **GRANTED** and Plaintiff's cross-motion for summary judgment (Dkt. No. 53) be **DENIED**; and it is further

**RECOMMENDED** that all claims against Defendant Otis be dismissed pursuant to Federal Rule of Civil Procedure 4(m); and it is further

**ORDERED** that the Clerk serve a copy of *Thomas v. Wright*, No. Civ. 9:99-CV-2071 (FJS/GLS), 2002 WL 31309190 (N.D.N.Y. Oct. 11, 2002) on Plaintiff in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written

objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE**

**APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v.*

*Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: May 27, 2009
            Syracuse, New York

George H. Lowe
United States Magistrate Judge